# EXHIBIT 1

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

LICIA PRICE,

          Plaintiff,                                Case No. 2025-    -CD

                                                      Hon.

v.

GENERAL MOTORS,
JACQUELINE VESSEL, in her
individual and professional capacity,
RONALD MCCANTS, in his
Individual and professional capacity,

          Defendants.

___

TODD F. FLOOD (P58555)
KATHERINE R. KOBILJAK (P88156)
FLOOD LAW, PLLC
Attorney for Plaintiff
155 W. Congress St., Ste. 350
Detroit, MI 48226
PH: (248) 547-1032
FX: (248) 547-0140
tflood@floodlaw.com
kkobiljak@floodlaw.com

___

There is no civil action between these parties arising out of the same
transaction or occurrence as alleged in this Complaint pending in this Court,
nor has any such action been previously filed and dismissed or transferred
after having been assigned to a judge.

## COMPLAINT

**NOW COMES** LICIA PRICE, by and through counsel, FLOOD LAW, PLLC for her Complaint against Defendant, GENERAL MOTORS, JACQUELINE VESSEL, and RONALD MCCANTS, states as follows:

1

## INTRODUCTION

This is a case in which our Plaintiff, Licia Price, had to endure systemic racism, sexism, and harassment over her 25-year career at General Motors (GM). Ms. Price should have been able to retire with an accolade-ridden career, but instead of being able to look proudly upon her accomplishments, her time at the company was riddled with needless beratement and harassment from superiors, causing unnecessary stress and health issues that she never would've expected when she began at GM.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.
2. Plaintiff, an African American woman, brings claims in this lawsuit under Title VII of the Civil Rights Act (Title VII), 42 USC 2000e et seq., the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq., and Intentional Infliction of Emotional Distress.
3. At all times relevant hereto, Plaintiff LICIA PRICE (hereinafter referred to as "Licia" or "Plaintiff") was and is a resident of Grosse Pointe Park, County of Wayne, State of Michigan.
4. At all times relevant hereto, Defendant RONALD MCCANTS was and is an employee of General Motors, headquartered in Detroit, County of Wayne, State of Michigan.
5. At all times relevant hereto, Defendant JACQUELINE VESSEL was and is an employee of General Motors, headquartered in Detroit, County of Wayne, State of Michigan.
6. At all times relevant hereto, Defendant GENERAL MOTORS was and is a company headquartered in Detroit, County of Wayne, State of Michigan.

7. This action alleges that General Motors employees, Defendants JACQUELINE VESSEL and RONALD MCCANTS, instigated and maintained a pattern of workplace harassment and retaliation.

8. Jurisdiction is proper under MCL 37.2801(2), which grants jurisdiction to an appropriate county circuit court for cases arising under the ELCRA, MCL 27.2101 et seq.

9. This Court has subject matter jurisdiction as the amount in controversy exceeds $25,000.00 exclusive of costs, interest, and attorney's fees.

10. Venue is proper pursuant to MCL §600.1627 as the events giving rise to this cause of action occurred within the City of Detroit, County of Wayne, State of Michigan, and this matter is otherwise within this Honorable Court's jurisdiction.

## GENERAL ALLEGATIONS

11. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

12. In March of 2016, Licia was chosen by GM Vice President Kurt McNeil to serve as the lead University of Notre Dame Recruiter in addition to her current role as Field Operations Manager.

13. In 2017, Mr. McNeil sent Licia a congratulatory email regarding her successful completion of the recruiting role. Licia responded with appreciation. In his reply, Mr. McNeil copied Director Maurice Williams, who was the direct supervisor of Licia's manager, Carlos Latour. Mr. Williams then forwarded the exchange to Mr. Latour.

14. Shortly thereafter, Mr. Latour reprimanded Licia for bypassing the chain of command and communicating directly with senior leadership. However, male colleagues who engaged in similar communication with Mr. McNeil during this time were not disciplined. In her 2017

CAP Year-End performance review, Mr. Latour explicitly noted, "Licia needs to keep in mind that she should keep her direct supervisor informed when she communicates directly with Leadership." This remark accompanied a downgraded evaluation, which directly impacted her merit-based pay increase for that year.

15. On February 23, 2018, **Defendant McCants told Licia that her corporate photo was "inappropriate" because her shoulders were showing** and ordered her to change it. This showed a **clear bias**, as other female employees had more revealing corporate photos and were allowed to keep their photos.

16. In August and September of 2018, Defendant McCants frequently and publicly accused Licia for allegedly failing to complete tasks on time, despite having already received clear, timely proof of their completion. Nevertheless, he continued to request progress updates on assignments that had already been delivered or previously discussed, creating a pattern of unjustified scrutiny and public shaming.

17. Later in August 2018, Defendant McCants violated internal policy by directing Licia to make changes to his calendar, a task reserved for secretarial staff. After confirming with the department secretary that that was not within Licia's job description, she responded to Defendant McCants to request that those duties remained with those prepared to undertake them. This response was later used against her in her performance evaluation, where Defendant McCants accused her of lacking flexibility regarding her job duties.

18. On or around October 24, 2018, Licia requested a facilitated meeting with HR representative Laura Saffron and Defendant McCants in an effort to address ongoing miscommunication and microaggressions directed at her by Defendant McCants. Following this meeting, Defendant McCants retaliated by downgrading Licia's performance review, which directly affected her merit pay and future career progression. This incident marked the beginning of a

4

documented pattern of retaliation in response to Licia's attempts to seek support through proper HR channels.

19. On August 8, 2019, Licia was pressured to approve a buy-sell agreement for Lonnie Bennett to become the approved Cadillac dealer in Beverly Hills. Mr. Bennett was a minority candidate, and GM was actively pursuing its minority representation targets. However, Mr. Bennett did not meet the internal policy requirements for dealer approval. Licia initially declined to approve the deal, citing policy violations and submitting formal documentation to that effect. Despite following proper protocol, Licia was subjected to harassment, including direct pressure from senior leadership and increasingly hostile interactions in an effort to force the approval. Her commitment to upholding GM's compliance standards was viewed as an obstacle to achieving internal diversity targets, effectively placing her in a position where adherence to policy was penalized.

20. Licia steadfastly refused to manipulate GM's minority dealer count to falsely claim diversity credit, as it violated internal policy. This decision was met with friction and was frequently brought up in negative tones, making Licia feel like she was going to face retaliation.

21. This pattern of retaliation escalated on January 6, 2020, when Licia refused to approve a Buy/Sell transaction in Gilroy, CA, citing concerns that it would be in violation of state franchise statutes. Celeste Briggs, a GM compliance advisor responsible for interpreting state law, confirmed that GM Executive Leadership could not hold ownership in this dealership and that the transaction was indeed non-compliant.

22. Despite clear legal validation from Ms. Briggs, Licia was pressured by senior leadership to support the non-compliant transaction, further punishing her for prioritizing legal integrity over executive influence. Four senior executives continued to apply pressure, urging Licia to "stay close" to the request, signaling an intent to push the deal forward despite its known

5

violations of state law and GM policy. When Licia raised her concerns with her direct supervisor, she was mocked and condescendingly asked whether she could "read an org chart," sending a clear message that legal compliance and ethical conduct was subordinate to executive directives.

23. Notably, in her 2020 year-end review, Licia received an "Average" performance rating, while other employees who supported the transaction or remained silent were celebrated and promoted for "Winning with Integrity," one of GM's Core Behaviors. This impressed upon Licia that acting with true integrity was penalized, and those who disregarded company and public policy in the name of executive directives were celebrated.

24. On September 13, 2022, Licia secured a leadership engagement meeting with Defendant Vessel through GM's fundraising initiative. This meeting was meant to be a career development opportunity, and Licia felt optimistic about what was to come. Instead, Defendant Vessel berated her for 48 minutes, making personal and religious attacks.

25. Defendant Vessel **repeatedly told Licia she needed to "atone like an alcoholic in AA"**, an offensive and inappropriate characterization.

26. Defendant Vessel then **produced a Bible and began praying over Licia**, which was unsolicited and made Licia deeply uncomfortable.

27. When Licia questioned her behavior, Defendant Vessel referenced a minor workplace issue from years prior—a trivial event where Licia donated money instead of wearing a blue shirt to show support for an initiative. This gave the impression that Defendant Vessel was still holding a personal grievance against Licia and using it to justify mistreatment and religious harassment.

28. In another interaction with Defendant Vessel, Licia was asked whether she had ever eaten "coon," a racially charged and demeaning reference. When Licia responded that she had not,

6

Defendant Vessel remarked that when she was growing up, meat was a luxury during her upbringing, and that Licia "wouldn't know anything about that" because she was "new money." She went on to assert that Licia had never experienced real struggles in a demeaning tone, implying that this was a character flaw for Licia. These remarks were not only deeply inappropriate, but also laced with discriminatory undertones rooted in both racial and socioeconomic bias.

29. Licia was then faced with yet another situation where she was pressured to approve a minority dealer that did not meet GM's internal policy's qualifications. Licia again submitted formal documentation that the deal was non-compliant, as she was supposed to in these sorts of decisions.

30. On January 26, 2024, Licia submitted a comprehensive onboarding process file that she had independently developed to support all new hires within Defendant Vessel's department. She sent the document to Tia Hardeman, her immediate supervisor at the time, and copied Defendant Vessel. Rather than acknowledging the value of the contribution, Defendant Vessel questioned who authored the file, suggesting that two other employees (Jennifer Gregorio and Christina Hunter) were responsible. Licia clarified that she was the sole creator and substantiated her authorship by providing timestamps, detailed data, and screen captures as evidence. Defendant Vessel ignored this clarification, again asking for clarity on who truly authored the document. Despite this clear documentation and initiative, Ms. Gregorio and Ms. Hunter were later promoted, while Licia was demoted, even though she was the one who had made the contribution. This sequence reinforced a troubling pattern: Licia's achievements were repeatedly dismissed or credited to others, while she suffered professionally for challenging the status quo.

7

31. On February 2, 2024, at the direction of Defendant Vessel, GM HR Partner Ebony Thompson contacted Licia to discuss talent planning and potential career opportunities. During the call, Ms. Thompson conveyed strong enthusiasm about Licia's advancement within the company and indicated she would actively support her growth. Licia responded the same day, and a career progression discussion was scheduled. Despite the promising tone of the exchange, GM failed to take any concrete action, and all subsequent follow-ups by Licia were ignored. This misleading engagement created a false impression of support while masking a parallel effort to marginalize her.

32. On March 21, 2024, during a meeting with Defendant Vessel, Licia was abruptly informed of her reassignment to the role of Field Operations Manager (FOM), which was a position she had previously held years earlier. Such reassignments are commonly recognized as demotions by GM, particularly when they involve a reduction in team size, influence, or strategic responsibility. This change was made without prior notice, explanation, or any documented performance issues, marking a significant and unjustified step back in Licia's career.

33. As a Dealer Operations Manager (DOM), Licia had led a larger, permanent team and was responsible for overseeing key regional operations. After exercising her right to seek advancement, she instead was demoted to the FOM position, which involved supervising fewer individuals, and eventually no one at all. This reassignment significantly reduced her leadership scope, strategic visibility, and compensation, as salary was directly tied to team size. The downgrade was not performance-based, further demonstrating the retaliatory pattern of sidelining Licia for asserting her rights. Further, it contributed to an increasingly hostile work environment, eroding Licia's professional standing and advancement opportunities.

34. The day after the demotion was announced, a company-wide email was circulated regarding Licia's reassignment. In response, Licia sent a professional and courteous message to

8

Defendant Vessel, thanking her for the opportunity and reaffirming her commitment to apply her experience effectively in the new role. Her intent was to demonstrate grace and adaptability despite the adverse change.

35. Shortly after Licia's follow-up message was sent to Vessel, her then-supervisor, Tia Hardeman, called her in a state of concern. Ms. Hardeman informed Licia that Defendant Vessel had misrepresented the contents of her email to other senior leaders, falsely claiming that Licia intended to "abandon" her role. This distortion was entirely baseless and forced Licia to conduct significant damage control. To set the record straight, Licia forwarded the original message to Ms. Hardeman, which immediately clarified the true professional nature of her email and exposed the deliberate mischaracterization. This, yet again, demonstrates a pattern of efforts designed to undermine Licia's credibility with those surrounding her at GM.

36. In the aftermath of the demotion and the surrounding confusion, Licia re-engaged with Ebony Thompson, who had previously reached out about advancement opportunities (as detailed in ¶31). Licia expressed concern about the shrouded nature of the reassignment process and sought to revisit the career development discussion they had begun earlier that year. At that point, neither HR nor senior leadership had provided any rationale or constructive explanation for the reassignment. For example, when Licia asked Defendant Vessel directly for an explanation regarding the demotion, Vessel dismissed the concern, stating "at least I didn't move you out of state," which offered no constructive feedback on performance, qualifications, or future expectations.

37. Licia was finally able to meet with Ms. Thompson on April 18, 2024. This meeting suddenly took a turn, with Ms. Thompson becoming verbally aggressive and hostile, telling Licia that "I don't care" about keeping the meeting civil.

38. This volatile situation made Licia deeply uncomfortable, so she immediately ended the conversation. While attempting to leave the room, Ms. Thompson made a move that momentarily physically blocked Licia from exiting and almost made physical contact that would have pushed her over.

39. This left Licia so unnerved that she emailed her boss and told him she had to leave the building immediately to recover.

40. Licia then requested a meeting with the GM Vice President of HR, Cyril Rauscher, on April 19, 2024, seeking guidance regarding the continued hostility from HR and her demotion. Licia cleared the meeting with her direct leader, Mike Johnson, and Mr. Rauscher assured her during their meeting that there would be no retaliation.

41. However, Defendant Vessel retaliated against Licia for this meeting in three separate ways.

42. For her 2024 Year-End Performance Review, **Defendant Vessel and Kurt McNeil intervened to recalibrate Licia's performance rating downward, overriding the positive evaluations provided by both her direct supervisor and Ms. Hardeman.** This deliberate downgrade was a direct contradiction against the assessments of those who worked closest to Licia, implying a retaliatory motive.

43. This performance review process provides yet another clear example of retaliation in response to Licia's efforts to seek support from GM's Human Resources department—an internal resource that, by policy, is intended to protect employees from exactly this type of behavior.

44. These altered performance reviews are also in sharp contrast to her review from the previous year, where Licia is highly praised for her leadership skills and contributions to the team. **Exhibit B, 2023 Review.**

45. Defendant Vessel further retaliated **by reducing Licia's merit pay increase** by unjustifiably overriding and recalibrating her performance rating to "Partially Meets Requirements," despite

10

the fact that two of her direct supervisors, Tia Hardeman and Mike Johnson, had both rated her as "Meets Expectations."

46. In a final act of retaliation, **Defendant Vessel cut Licia's annual bonus by 50%.** When Licia inquired about the reason for the sharp reduction, **Ms. Hardeman explicitly stated during Licia's February 3, 2025 performance review that it was a direct result of Licia's decision to meet with GM's Vice President of HR,** Cyril Rauscher. This admission left no ambiguity that the reduction was punitive and retaliatory, even though Licia had raised her concerns through protected internal channels.

47. The entire review process revealed a deliberate act of retaliation. Licia's direct supervisors had rated her performance as "Meets Expectations" based on their firsthand knowledge of her work. However, she was informed by both Ms. Hardeman and Defendant McCants that Defendant Vessel—alongside Kurt McNeil—intervened to override those assessments, downgrading her evaluation to "Partially Meets Requirements." Licia experienced financial harm as a result, as performance ratings were directly tied to compensation, bonus eligibility, and future advancement. This manipulation directly contradicted the assessments of those with firsthand knowledge of her work and was clearly intended to damage her professional standing.

48. Licia was formally presented with this altered performance review on February 3, 2025 during a meeting attended by Defendant McCants and Ms. Hardeman.

49. Following this meeting, Licia sent a summary email on February 5, recapping the discussion and expressing her concerns. In response, Defendant McCants requested a live meeting to continue the conversation. Licia indicated she was only comfortable doing so in person, and with her current leader, Doug Susitko, present to ensure transparency and fairness.

11

50. However, Defendant McCants refused to accommodate this request for a neutral witness and insisted that the only acceptable addition would be Defendant Vessel, who had participated in the retaliatory acts. Given the inherent conflict and lack of trust, Licia declined to attend the meeting under those terms.

51. Subsequently, on February 24, the final altered version of the performance review was delivered to Licia, confirming the manipulated rating.

52. On March 7, 2025, Licia sent a formal retaliation complaint to the GM Aware Line. In her complaint, she attached a more in-depth document that expanded upon her allegations. **Exhibit A.** She was not contacted about this report until April 28, at which time she was no longer employed by GM. GM made no further attempt to follow up on the matter until August, after receiving numerous inquiries from Licia and her counsel.

53. Later on March 7, Licia began experiencing persistent chest pain. Her cardiologist was concerned that she was displaying signs of a heart attack, and instructed her to go to the hospital immediately.

54. Licia was discharged from the hospital later that night and went to her primary care physician for a follow-up appointment later that week. Based on elevated cortisol levels and symptoms consistent with **severe stress**, she was advised to take medical leave, as her life was at risk. Licia followed her physician's recommendation and began a protected leave period.

55. On April 25, GM informed Licia by email to her personal email address that she had been terminated. No official meeting, written justification, or formal HR process was offered beforehand, **nor was the fact that she was still on medical leave addressed.**

56. Despite receiving notice of intent letters requesting that all contact be made through Licia's attorney's office, GM continued to barrage Licia with phone calls and emails, including a call to her home phone number in which they revealed to Licia's 91-year-old mother, who has

been diagnosed with chronic anxiety, that she had been fired. This call revealed sensitive employment information that Licia had deliberately withheld from her mother for health reasons, demonstrating that the emotional harm from this saga spread to more than just Licia.

## COUNT I
## HOSTILE ENVIRONMENT AND HARASSMENT
## IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

57. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

58. At all pertinent times, Plaintiff was an employee of Defendant General Motors.

59. The ELCRA prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment, because of the employee's religion, race, color, national origin, or sex. MCL 37.2202(1)(a).

60. During her employment with Defendants, Plaintiff was subjected to harassment and intimidation by Defendants, as described above in General Allegations.

61. Some of these incidents included, but are not limited to, Defendant McCants singling her out and telling her that her shoulders showing in her corporate photo was too revealing; Defendant Vessel praying over Licia and telling her she needed to atone in an unsolicited and inappropriate manner; Defendant Vessel telling Licia she had "never eaten 'coon'" in an accusatory manner; and both Defendants Vessel and McCants manipulating Licia's performance reviews to undermine her achievements with the company.

13

62. The ELCRA also prohibits employers from segregating or classifying employees in a way that would tend to deprive them of opportunities on the basis of their religion, race, color, national origin, or sex. MCL. 37.2202(1)(b).

63. Licia was also told not by Defendants to reach out to the superiors above Defendants Vessel and McCants about these issues, and when she did, she was needlessly berated for using her resources. In fact, these conversations were the root of Defendants lowering her performance review, thus decreasing her avenues for promotion, merit bonuses, and career advancement.

64. This behavior had the had the purpose and/or effect of substantially interfering with Plaintiff's employment and/or creating an intimidating, hostile, and offensive employment environment.

65. Defendant's conduct violated the Elliot-Larson Civil Rights Act.

**COUNT II**
**DISCRIMINATION ON THE BASIS OF RACE**
**IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**

66. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

67. At all pertinent times, Plaintiff was an employee of Defendant General Motors.

68. The ELCRA prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment, because of the employee's religion, race, color, national origin, or sex. MCL 37.2202(1)(a).

69. During her employment with Defendants, Plaintiff was subjected to discrimination by Defendants because of her race, as described above in General Allegations.

70. Some of these incidents included, but are not limited to, demoting Plaintiff, misrepresenting Plaintiff's statements in a negative light to other GM employees, Defendant Vessel praying over Licia and telling her she needed to atone in an unsolicited and inappropriate manner; Defendant Vessel telling Licia she had "never eaten 'coon'" in an accusatory manner; and both

14

Defendants Vessel and McCants manipulating Licia's performance reviews to undermine her achievements with the company.

71. Defendant's discriminatory conduct based on race violated the Elliot-Larson Civil Rights Act.

72. As a direct and proximate result of GM's wrongful acts and omissions, by and through its employees, agents and representatives, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits; and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT III

### RETALIATION / RETALIATORY HARASSMENT IN VIOLATION OF TITLE VII

73. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

74. At all pertinent times, Plaintiff was an employee of Defendant General Motors.

75. Title VII prohibits employers from discriminating against any individual regarding the compensation, terms, conditions, or privileges of employment because of their race, color, religion, sex or national origin. 42 USC 2000e-2(a)(1).

76. Plaintiff experienced this through off-color comments about showing her shoulders in her company photo, being prayed over without her permission, being told she needed to "atone," and other incidents included, but not limited to, in this complaint.

77. Title VII further prohibits employers from segregating or classifying employees in a way that would tend to deprive them of opportunities on the basis of their race, color, religion, sex or national origin. 42 USC 2000e-2(a)(2).

78. Because of her above-mentioned complaints about unwelcome intimidation, national origin discrimination, religious discrimination, and harassment, Plaintiff was subjected to retaliation and retaliatory harassment including, but not limited to, demotions without justification,

15

withholding of her bonuses, and ostracization by Defendants, which led to career advancement opportunities diminishing, as described above in General Allegations, because she expressed concerns of harassment and discrimination in violation of Title VII.

79. Licia explicitly asked if she would be retaliated against for asking Defendants Vessel and McCants's superiors for help when attempting to resolve her demotion and lack of communication, and was told no. However, her performance review was altered, and Ms. Hardeman specifically cited Licia going to those superiors as the reason Defendant Vessel manipulated her performance review.

80. Participation in an employment discrimination proceeding, which could include reporting employment discrimination or cooperating with an internal investigation, is protected activity even if the proceeding involved claims that ultimately were found to be invalid.

81. Plaintiff explicitly faced retaliation and retaliatory harassment as the result of her participation in a protected activity pursuant to Title VII. When attempting to resolve minor issues and various harassment incidents while at GM, Defendants McCants and Vessel retaliated by demoting Plaintiff, as well as decreasing her performance review numbers—which was admittedly done to retaliate against Plaintiff for going to HR. GM's conduct, by and through its employees, agents and representatives, violated Title VII.

82. As a direct and proximate result of GM's wrongful acts and omissions, by and through its employees, agents and representatives, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits; and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

16

83. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

84. Defendants engaged in extreme and outrageous conduct through the following actions, including and not limited to:

    a. Decreasing her performance evaluation metrics over her direct superior's evaluations, thereby limiting her career advancement opportunities and decreasing her income;

    b. Publicly singling her out for mistakes that she did not make;

    c. Praying over her and telling her she needed to "atone;" and

    d. Retaliating against her for using her resources, such as HR, when attempting to resolve issues presented by Defendants.

85. Defendants acted intentionally when they committed these outrageous acts.

86. Defendants intentionally caused Plaintiff severe emotional distress by enabling emotional hostility and retaliation throughout her career whenever she attempted to resolve miscommunications or deliberate manipulation of her work environment.

87. As direct and proximate result of Defendants' intentional infliction of emotional distress, Plaintiff experienced significant mental anguish and distress, was denied the benefits of the career advancement at GM, experienced pain and suffering, emotional distress, an onslaught of heart conditions as a result of said distress, and emotional regression.

88. As a result, Plaintiff has suffered injuries including and not limited to those detailed in the above complaint.

## COUNT V

## VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT (FMLA)

89. Plaintiff hereby realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

90. At all pertinent times, Plaintiff was an employee of Defendant General Motors.
91. The FMLA prohibits employers from discriminating or retaliating against an employee for having exercised their rights under FMLA.
92. Plaintiff engaged in protected activity under FMLA when she took medical leave based on her doctor's recommendation due to stress-related health issues.
93. Because of Plaintiff's protected activity, Defendant discriminated and retaliated against Plaintiff, including but not limited to terminating her while she was on medical leave.
94. As a direct and proximate result of GM's wrongful acts and omissions, by and through its employees, agents and representatives, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits; and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment.

**WHEREFORE**, Plaintiff LICIA PRICE prays that this Honorable Court grant the following remedies:

A. Declare that the aforementioned practices and actions of Defendants constitute unlawful employment practices in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 USC §2000e et seq., the Elliott-Larsen Civil Rights Act, MCL § 37.2101 et seq., MCL §600.2911, and Michigan Common Law.

B. Award Plaintiff all lost wages and the value of fringe benefits, past and future, to which she is entitled;

C. Award Plaintiff compensatory damages;

D. Award Plaintiff punitive damages;

E. Award Plaintiff exemplary damages;

F. Award Plaintiff reasonable attorney's fees, costs, and interest; and

18

G. Award Plaintiff such other relief as this Court deems just and proper.

## CONCLUSION

WHEREFORE, based on the foregoing allegations, Plaintiff LICIA PRICE, requests this Honorable Court to enter a judgment in her favor against Defendants GENERAL MOTORS, JACQUELINE VESSEL, and RONALD MCCANTS in whatever amount in excess of $25,000 to which they are found to be entitled together with exemplary damages, costs, interest, and attorney's fees.

Respectfully submitted,

**FLOOD LAW, PLLC**

By: /s/ Todd F. Flood
Todd F. Flood (P58555)
Katherine R. Kobiljak (P88156)
Flood Law, PLLC
Attorney for Plaintiff
155 W. Congress St, Ste. 350
Detroit, MI 48226
PH: (248) 547-1032
FX: (248) 547-0140
tflood@floodlaw.com
kkobiljak@floodlaw.com

Dated: August 8, 2025